Filed 2/10/15  P. v. Dominguez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066978 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1201430) |
| ADAN SANDOVAL DOMINGUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Eric G. Helgesen, Judge.  Affirmed as modified; remanded with directions for resentencing.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Adan Sandoval Dominguez of four counts of committing a lewd act on a child with force, violence, or duress (Pen. Code,[1] § 288, subd. (b)(1); counts 2, 4, 6, 7); one count of aggravated sexual assault of a child (oral copulation) (§ 269, subd. (a)(4); count 1); one count of aggravated sexual assault of a child (penetration) (§ 269, subd. (a)(5); count 3); and committing a lewd act on a child (§ 288, subd. (a); count 5.) The jury also found true, as to all counts, Dominguez committed the crimes against more than one victim within the meaning of section 667.61, subdivision (e)(5). The court sentenced Dominguez to prison for 90 years to life.

Dominguez appeals, contending: (1) the trial court erred when it found him competent to stand trial; (2) the evidence was insufficient to support his conviction under count 4 for violating section 288, subdivision (b)(1); (3) his due process rights were violated when the court sentenced him under the amendments to the One Strike law (§667.61); (4) the trial court erred when it imposed One Strike sentences on counts 5 and 6; (5) his sentence for count 5 was improper because the jury made no findings as to his probation eligibility; and (6) the abstract of judgment must be corrected to reflect the sentence actually imposed by the court.

We agree that the evidence was insufficient to support Dominguez's conviction under count 4 for violating section 288, subdivision (b)(1). However, the evidence was sufficient to convict Dominguez under section 288, subdivision (a) as to count 4. We thus modify the judgment accordingly. In addition, we are persuaded that the court

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

improperly sentenced him under the One Strike law without realizing that it had the discretion to run Dominguez's sentences under section 288, subdivision (b)(1) consecutively or concurrently. As such, we remand this matter to the trial court for resentencing consistent with this opinion. The trial court is to enter a new abstract of judgment to conform to Dominguez's new sentence. We conclude that Dominguez's other contentions are without merit.

## FACTUAL BACKGROUND

### Crimes Against Maria

Maria was 19 years old at the time of trial. At the age of five, Maria often attended family gatherings at the home of her grandparents. Dominguez, Maria's uncle, was often present. He began molesting her at these family gatherings.

Maria testified that the first act of molestation occurred in her grandmother's bedroom. As Maria was playing, Dominguez came in and told her to put on a dress. Dominguez said that Maria's dad would be angry if she refused. After Maria complied, Dominguez forced her down onto the bed, pulled off her underwear and began orally copulating her. Maria was afraid and asked Dominguez to stop. Dominguez responded that "it was natural. It's what adults do." Dominguez stopped when Maria's father knocked on the door.

For the next seven years, Dominguez routinely molested Maria. Whenever Maria saw Dominguez, he would attempt to kiss her, force his tongue into her mouth, and rub his leg against her vagina. Sometimes Dominguez would remove his penis from his shorts and instruct Maria to look at it. Dominguez would tell Maria that she was

3

beautiful and that he loved her.  On one occasion, as Maria was playing with her cousin Stephanie, Dominguez entered the room, closed the door, lay down on the bed and "grabbed himself."  Dominguez  instructed the girls to kiss and touch each other's vaginas.

## Crimes Against Nancy

Nancy was 20 years old at the time of trial.  As a child, Nancy often attended family gatherings where Dominguez, her uncle, was present.  Dominguez began molesting Nancy when she was eight.

While visiting Dominguez 's home at age eight, Nancy sat in the living room to watch television.  Everyone else was in the kitchen.  Dominguez came in, sat down next to Nancy and instructed her to bend over the armrest so that he could give her a massage.  Scared of Dominguez, who had previously hit her, Nancy complied.  Dominguez put his hand into Nancy's pants and touched the skin of her vagina.

When Nancy was 11, Dominguez  came over to her house and asked for a "tour."  When the tour reached the study, Dominguez asked Nancy if she had ever been kissed.  When Nancy replied no, Dominguez asked if he could kiss her.  Although Nancy had declined, Dominguez kissed her anyway.  He used his tongue.  Dominguez also asked Nancy to "look at the piece of paper."  When she did, Nancy saw Dominguez's exposed penis.

Later the same day, Dominguez forced Nancy to bend over a couch in the living room.  He then touched the skin of her vagina with his hand.  Dominguez  next grabbed Nancy's hand, put it into his pants, and forced her to rub his penis.  Nancy testified that

4

Dominguez told her not to tell, or "bad things would happen."  Finally, Nancy stated that Dominguez routinely hugged her and told her he loved her.

## Crimes Against Stephanie

Stephanie was 20 years old at the time of trial.  As a child, Stephanie often attended family gatherings where Dominguez, her uncle, was present.  Dominguez began molesting Stephanie when she was about six years old.

While Stephanie was visiting Dominguez's home when she was six, Dominguez told her to go outside and come around to his bedroom window.  When Stephanie complied and arrived at the window, Dominguez "pulled" her up and through the window.  Although her parents were present at the house, Stephanie was alone with Dominguez in his bedroom.  Sitting on Dominguez's bed, Stephanie's pants were pulled down (she could not recall by whom) to her ankles and Dominguez digitally penetrated her.  Dominguez removed his fingers and "licked them."  Stephanie testified that although she did not fear Dominguez, she did not want to be touched by Dominguez and was confused by it.

Stephanie testified that a couple of years later she was driving with Dominguez, alone, on the freeway.  As Dominguez drove, he reached over to her in the passenger seat, and touched her vagina over her clothing.  Stephanie did not want Dominguez to touch her.

## Dominguez's Confession

Dominguez made numerous incriminating statements to police, which were introduced to the jury during the testimony of Riverside County Sheriff Investigator Joel

5

Pabelico. Dominguez reported all three girls, Maria, Nancy, and Stephanie to be his nieces. Dominguez admitted "touch[ing] and fondl[ing]" Maria when she was between six and eight years old. The acts occurred on four or five occasions, and included touching her vagina and butt. Dominguez kissed Maria on the lips. Dominguez similarly fondled and touched Nancy when she was between eight and 10 years old. He told police that he gave into "weakness" and "temptation." He admitted he grabbed Nancy's hand and made her touch his penis. Dominguez touched her vagina and butt. As to Stephanie, Dominguez admitted touching her between the ages of six and eight. Dominguez molested Stephanie as many as 10 times, touching her vagina and butt. He did so at multiple locations, including in a car. Stephanie, he said, was one of his "favorite nieces." Dominguez stated, "She would just do it every morning. I went in there and, you know, her clothing — and then she would ask me if I was gonna touch her or not."

DISCUSSION

I

*DOMINGUEZ'S COMPETENCE TO STAND TRIAL*

A. Background

Domenique Manning, a clinical therapist for the Robert Presley Detention Center, testified that she diagnosed Dominguez as experiencing a major depressive disorder. Although Manning stated that Dominguez appeared to have difficulty concentrating, she stated that he participated in the interview and answered Manning's questions. Manning testified that during the two-hour interview, Dominguez reviewed, appeared to

6

understand, and ultimately signed several documents, including a consent to release medical records form.

Psychologist Kenneth Kaisch, engaged Dominguez in a 60-minute evaluation on March 7, 2013. Kaisch opined Dominguez was suffering from a major depressive disorder. Kaisch testified Dominguez's depression was based on the criminal charges against him, medical issues he was suffering, and the loss of his career as a truck driver. Kaisch believed that Dominguez's diagnosis would cause him to "not be engaged" in his trial, listen, or assist his attorney in any way. Moments after opining Dominguez to be incapable of paying attention, Kaisch was asked by Dominguez's attorney to identify which of Dominguez's toes had been amputated since he had been in jail. Dominguez immediately interrupted Kaisch's testimony and identified the location of the removed toe.

Kaisch further discussed Dominguez's two in-custody medical issues, the amputations of a toe, and then foot, as relevant to his competency determination. Kaisch offered that Dominguez had been less concerned with the second medical issue than with the first, which Kaisch opined to be consistent with Dominguez's being depressed and further supporting the conclusion that Dominguez would not participate in his trial because it suggested a lack of "self-beneficial behavior." However, when being examined by the trial court, Kaisch admitted that he had "foolishly" neglected to ask Dominguez any questions about the differences, if any existed, in his efforts to receive medical attention as to each issue.

7

Kaisch disagreed that Dominguez had displayed malingering. The "giveaway" was "the lack of adventitious movement" during the 60-minute interview. Kaisch emphasized that "[p]eople cannot maintain the same posture for an hour with no significant movement under normal circumstances." Nonetheless, Kaisch testified that Dominguez participated throughout the interview, maintained eye contact, answered questions, and even added "additional information" that Kaisch did not specifically request. Kaisch testified that Dominguez knew the date of his arrest, knew where he had been arrested, and knew which jail he was in. Dominguez, a diabetic, was further knowledgeable about his blood sugar level as it constituted a significant life issue. Kaisch agreed that being charged in the present case with molesting children also constituted an important life issue.

As to the nature of the criminal proceedings against him, Kaisch testified that Dominguez explained to him his understanding of the respective roles of the trial judge, prosecutor, and defense attorney. Although Kaisch believed Dominguez to be oriented in time and place, as well as coherent and rational, Kaisch opined that such characteristics were not inconsistent with his diagnosis. According to Kaisch, a person suffering major depressive disorder can continue to possess intellectual function.

Deputy Public Defender Nicole Williams testified that she formerly represented Dominguez in the instant matter until concluding on the day set for trial that Dominguez was incompetent. Williams testified that when she began representing Dominguez in March 2012, he participated in his case. However, by February 2013, Dominguez was "not as responsive," appeared lethargic and in physical discomfort. On the day set for

8

trial, February 22, 2013, Dominguez cried and "seemed despondent." Thus, that day, Williams declared doubt as to Dominguez's competency.

As Dominguez appeared to fall asleep numerous times that day, Williams testified that she requested assistance with providing Dominguez snacks during proceedings to maintain his blood sugar at an appropriate level. However, this course proved unsuccessful as Dominguez was allergic to some of the snacks that were provided. Williams testified that during trial, Dominguez would be subject to long days, wherein he would be required to wake up at 4:30 a.m.

During Williams's testimony, it was also established that Dominguez's foot amputation had occurred less than two weeks before the February 22, 2013 trial date where Dominguez fell asleep and was depressed.

After hearing the evidence and the argument of counsel, the trial court ruled Dominguez competent to stand trial. The court stated that it believed Dominguez to have been competent on the previous, February 22, 2013 trial date, but that date had simply been too soon after Dominguez's foot amputation. The court stated that given the very serious nature of the surgery, coupled with the "pretty heavy pain medication" that Dominguez had been taking, it was no surprise Dominguez was falling asleep.

As to its conclusion that Dominguez was competent to stand trial, the court further reasoned that it had not been convinced by a preponderance of the evidence that Dominguez "doesn't understand the nature and purpose of the proceedings." The court found that Dominguez possessed the ability to rationally cooperate with his attorney. The court stated that it agreed that Dominguez suffered from a major depressive disorder

9

given the amputations and the reality that he was looking at spending the rest of his life in prison. Notwithstanding his depression, the court concluded Dominguez to be competent to stand trial.

### B. Law and Analysis

Trial of an incompetent defendant violates an accused's right to due process. (*People v. Weaver* (2001) 26 Cal.4th 876, 903; accord, *Medina v. California* (1992) 505 U.S. 437, 448.) The United States Supreme Court has defined competence to stand trial as a defendant's " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' " and " 'a rational as well as factual understanding of the proceedings against him.' " (*Dusky v. United States* (1960) 362 U.S. 402.) Under California law, a person is incompetent to stand trial "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) A defendant is presumed mentally competent to stand trial "unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent." (§ 1369, subd. (f); see *People v. Medina* (1990) 51 Cal.3d 870, 881-886.)

On appeal a finding of competency to stand trial "cannot be disturbed if there is any substantial and credible evidence in the record to support the finding." (*People v. Campbell* (1976) 63 Cal.App.3d 599, 608.) "In reviewing a [fact finder's] determination that a defendant is competent to proceed to trial, we give due deference to the trier of fact, and therefore view the record in the light most favorable to the verdict. However, the verdict must be supported by substantial evidence. [Citation.] In determining the

substantiality of the evidence, we look to the record as a whole.  [Citation.]  Evidence that is ' " 'reasonable in nature, credible, and of solid value' " ' is substantial evidence."  (*People v. Frye* (1998) 18 Cal.4th 894, 1004.)  We "generally give[] great deference to a trial court's decision" on the defendant's competence to stand trial.  (*People v. Kaplan* (2007) 149 Cal.App.4th 372, 383, citing *People v. Marshall* (1997) 15 Cal.4th 1, 33.)

Relying principally on *People v. Samuel* (1981) 29 Cal.3d 489 (*Samuel*), Dominguez contends that the court's finding that he was competent to stand trial was not supported by substantial evidence.  We conclude *Samuel* is distinguishable from the instant matter.

The trial court in *Samuel*  held a pretrial competency hearing, as in this case, and "[T]he defense presented an impressive array of evidence demonstrating Samuel's present inability either to understand the nature of the proceedings against him or to rationally assist in the preparation and presentation of his defense.  [Citations.]  In all, five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified on Samuel's behalf.  In addition, four psychiatric reports were admitted into evidence.  Without exception, each witness and every report concluded that throughout the period during which the declarant observed the defendant, the latter was incompetent to stand trial.  In response, the prosecution offered no expert testimony whatever and only two lay witnesses, neither of whom contradicted any of the defense testimony."  (*Samuel*, *supra*, 29 Cal.3d at pp. 497-498.)

The expert evidence in *Samuel* "focus[ed] specifically on how Samuel's mental infirmities affected his ability to understand the proceedings and to assist his attorney."

11

(*Samuel, supra*, 29 Cal.3d at p. 500.) In the opinion of several experts, the defendant's " 'verbal blocking,' " hallucinations, and very low I.Q. would seriously impair his ability to assist counsel and he had only a very vague and confused idea as to what the trial was all about and his attorney's function. (*Id*. at p. 501.)

Against the "impressive body of evidence" produced by the defense, the prosecution offered "lay testimony that scarcely did more than indicate that defendant could walk, talk, and at times, recall and relate past events." (*Samuel*, *supra*, 29 Cal.3d at p. 503.)

In reaching its conclusion that the verdict was not supported by substantial evidence, the court stated: "Our power to weigh the evidence is of course limited by due deference to the trier of fact, and we must therefore view the record in the light most favorable to the verdict." (*Samuel*, *supra*, 29 Cal.3d at p. 505.) Nevertheless, there was "no real conflict in the testimony" and the court concluded that "the jury could not reasonably reject the persuasive and virtually uncontradicted defense evidence proving Samuel's mental incompetence to stand trial." (*Id*. at pp. 505-506.)

In contrast to the 13 witnesses in *Samuel*, *supra,* 29 Cal.3d 489 who testified that Samuel was incompetent to stand trial, Dominguez presented just three witnesses, only one of whom testified that he was incompetent to stand trial. The three witnesses consisted of two experts and Dominguez's former attorney. Of the two experts, only Kaisch opined Dominguez to be incompetent to stand trial. However, the trial court had reason to reject Kaisch's opinion.

Kaisch opined Dominguez to be completely uninterested in trial. According to Kaisch, this lack of interest would prohibit Dominguez from listening to testimony and participating with his attorney. Yet, moments after offering this testimony, when Dominguez's trial counsel asked Kaisch to identify the toe Dominguez had removed, Dominguez interrupted the examination to answer the question himself.

On cross-examination, the prosecutor asked Kaisch to explain Dominguez's ability to follow the testimony and answer a question Kaisch appeared unable to answer. Kaisch agreed that this instance evidenced Dominguez as interested and participating; however, Kaisch attempted to minimize the situation, offering that it merely showed that Dominguez had an interest "at that moment." The court, as the fact finder, could reasonably interpret Dominguez's act as indicating his present ability to pay attention and participate in his defense.

Moreover, Kaisch's opinion was also suspect because it was premised on Dominquez's handling of his two medical conditions that led to amputations. Kaisch initially testified that compared to the first issue (removal of his toe), Dominguez "showed a lack of concern, a lack of self-protection" regarding the second issue (amputation of his foot). Kaisch testified that this lack of self-protection "would have a pretty significant impact" on Dominguez's competency to stand trial because "if he doesn't care," he would likely "just sit there" during trial. This would "absolutely" compromise his defense at trial. Nevertheless, Kaisch subsequently revealed that he had not actually gathered information regarding Dominguez's handling of his two medical

13

issues. When the trial court examined Kaisch about this shortcoming, Kaisch responded that he had "foolishly" neglected to follow up on the subject.

Also, Kaisch indicated that his opinion was based, in large part, on information provided by Dominguez. During cross-examination of Kaisch, it became apparent that Dominguez had been less than forthcoming. For example, Dominguez told Kaisch that he was surprised that three children had accused him of molesting them. However, he failed to inform Kaisch that he had confessed to these crimes. Instead, Dominguez told Kaisch that "he said some things that were untrue due to severe police interrogation." But for Dominguez's claim to Kaisch that he was severely interrogated, there is no evidence in the record to support this allegation.

Dominguez largely ignores the discrepancies and faults in Kaisch's testimony, and instead, characterizes it as "uncontroverted" and implies that the court had to accept it. Not so. The trial court may weigh the reasons given by an expert witness for his or her opinion; it may accept some reasons and reject others. (*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 923.) Moreover, expert testimony, even if uncontradicted, is not binding on the trier of fact, and may be rejected. (*Samuel*, *supra*, 29 Cal.3d at p. 502.) Here, the court as fact finder was not required to accept Kaisch's opinion without scrutiny.

The two other witnesses were no more persuasive to the trial court than Kaisch. The other expert, Manning, testified that Dominguez was suffering from a major depressive disorder. This testimony mirrored Kaisch's opinion, but Manning did not opine that Dominguez was not competent to stand trial.

14

Noting that Dominguez faced life in prison, and had two fairly recent amputations, the trial court accepted the experts' respective opinions that Dominguez suffered a major depressive disorder. However, a diagnosis of major depression, by itself, does not mandate that a court find a defendant incompetent.

We also are satisfied that Williams's testimony did not establish Dominguez was incompetent. She testified that when initially assigned the case, Dominguez communicated with her. She only began to question Dominguez's competency when the matter was sent out for trial and Dominguez was "not as responsive," lethargic and uncomfortable. As noted by the trial court, Dominguez's foot had been amputated 10 days earlier. Given the serious nature of the surgery, coupled with Dominguez's pain medication, it was no surprise that he was falling asleep at that point. The court stated that it believed that trial should not have gone forward so soon after surgery. Nevertheless, this evidence did not establish that Dominguez was incompetent to stand trial and pales in comparison to the "impressive body of evidence" presented in *Samuel*, *supra*, 29 Cal.3d 489.

Despite Dominguez's arguments to the contrary, we are satisfied that substantial evidence supports the trial court's conclusion that Dominguez was competent to stand trial. As a threshold matter, as we discuss above, Dominguez did not carry his burden of establishing his incompetency by a preponderance of the evidence. Moreover, evidence provided by Dominguez actually proves his competence. For example, Kaisch agreed Dominguez was oriented in time and place, and he understood the roles of the judge, prosecutor, and defense attorney. In his report, Kaisch also agreed that Dominguez was

15

coherent and rational. This testimony supported the trial court's conclusion that Dominguez possessed "the ability to cooperate" with his attorney as well as the conclusion that he understood the nature and purpose of the criminal proceedings.

Further, Kaisch explained that Dominguez was able to provide information about his medical history and his employment in response to questions. Dominguez also volunteered certain information to Kaisch without being questioned, causing Kaisch to testify that he believed Dominguez was open and candid. In addition, Dominguez was able to recall specific dates and conversations.

Manning testified that during her interview of Dominguez, he reviewed, appeared to understand, and ultimately signed several documents, including a consent to release medical records form.

Simply put, we determine that substantial evidence supports the trial court's finding that Dominguez was competent to stand trial.

II

*COUNT 4*

Dominguez argues substantial evidence does not support the jury's verdict on count 4. We agree.

When considering a defendant's challenge to the sufficiency of the evidence, we review the entire record most favorably to the judgment to determine whether the record contains substantial evidence from which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. We do not reweigh evidence or reassess a witness's credibility and we presume the existence of every fact the trier of fact

16

could reasonably deduce from the evidence. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

The jury convicted Dominguez in count 4 of committing a lewd act on a child with force, violence, or duress. (§ 288, subd. (b)(1).) This count concerned Dominguez's molestation of Stephanie while she was riding in Dominguez's car with him. While Dominguez was driving, he reached over without warning and touched Stephanie's vagina over her clothes. Stephanie testified that neither she nor Dominguez said anything during or after the incident.

Section 288, subdivision (a), proscribes the commission of "any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ." Section 288, subdivision (b) punishes a lewd act described under subdivision (a) where it has been committed by "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ." (§ 288, subd. (b)(1).)

Here, the parties focus on whether sufficient evidence exists to support a finding that Dominguez used duress to molest Stephanie while she was riding in the car with Dominguez. Our high court stated that duress in the context of lewd act on a child means " 'the use of a direct or implied threat of force, violence, danger, hardship or retribution sufficient to cause a reasonable person to do [or submit to] something that he or she

17

would not otherwise do [or submit to]." (*People v. Soto* (2011) 51 Cal.4th 229, 246, fn. 9; italics omitted.) In determining whether duress was present, "[t]he total circumstances, including the age of the victim, and [her] relationship to defendant are factors to be considered in appraising the existence of duress." (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 51.) " ' "Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim" [are] relevant to the existence of duress.' " (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1319-1320.) " '[D]uress involves psychological coercion.' " (*Ibid*.) "Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family." (*People v. Cochran* (2002) 103 Cal.App.4th 8, 14 (*Cochran*).) "A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young and the defendant is her parent. . . . [S]uch a threat also represents a defendant's attempt to isolate the victim and increase or maintain her vulnerability to his assaults." (*Id*. at p. 15.)

The People argue the following evidence supports the conclusion that Dominguez employed duress in touching Stephanie. Dominguez was a trusted family member, Stephanie's uncle, and thus had a position of influence. Dominguez was more than 40 years older than Stephanie. The much larger Dominguez had Stephanie, a small child,

18

trapped in a car on a freeway when he molested her. Dominguez admitted he had molested Stephanie at least 10 times over the course of a two to three-year period.

The People further argue Dominguez had essentially groomed Stephanie to accede. By his own admission, when Dominguez "went in there" to molest Stephanie, she would "ask [] if I was gonna touch her or not." Relying on *Cochran*, *supra*, 103 Cal.App.4th 8, the People ultimately contend that, when viewed in the light most favorable to the verdict, the evidence would allow the jury to reasonably infer Dominguez applied duress so that Stephanie would "acquiesce in an act to which one otherwise would not have submitted." (*Id*. at p. 13.)

In *Cochran*, we concluded sufficient evidence of duress existed where a father was convicted of forcible lewd conduct on his nine-year-old daughter. (*Cochran*, *supra*, 103 Cal.App.4th at p. 12.) The daughter testified that her father instructed her to engage in various sexual acts including intercourse and forced sodomy. The daughter testified that she was not afraid of her father, but he told her not tell anyone because he would get into trouble and go to jail. (*Ibid*.) We noted that even though the defendant did not beat or punish her, he still coerced her into performing the various sex acts. (*Id*. at p. 15.) The defendant was five feet, nine inches tall and weighed 100 pounds more than his four foot, three-inch daughter. We determined that the daughter was a "vulnerable and isolated child who engaged in sex acts only in response to her father's parental and physical authority." (*Ibid*.) Given the age and size of the victim, her relationship to the defendant, and the implicit threat that she would break up the family if she did not comply, there was sufficient evidence of duress. (*Id*. at p. 16.)

19

Although the instant matter shares some similarities with *Cochran, supra*, 103 Cal.App.4th 8, a key difference is the lack of any evidence that Dominguez threatened Stephanie either implicitly or explicitly. For example, unlike the defendant in *Cochran*, there is no evidence from which the jury could infer Dominguez warned Stephanie that she would break up the family if she: (a) told anyone about what Dominguez was doing or (b) did not comply. Indeed, there appears to be no evidence in the record that: (1) Stephanie was afraid of Dominguez; (2) Dominguez threatened Stephanie if she did not comply; (3) Dominguez warned Stephanie of some negative consequence that would occur if she told someone about the molestation; or (4) Stephanie attempted to resist Dominguez's efforts to touch her and Dominguez overcame her resistance. To the contrary, when asked if she felt like she had to let Dominguez touch her, Stephanie responded: "I didn't feel anything. I didn't know." She also testified that she "didn't fear him." She "just didn't understand the situation." Further, Stephanie testified that she never talked to Dominguez about the instances in which he molested her. Nor did Dominguez say anything to her about them.

We observe that Dominguez was much larger and older than Stephanie. He also occupied a position of trust as Stephanie's uncle and touched her lewdly multiple times. However, without additional evidence by which duress could at least be inferred, the evidence here is insufficient to support a finding of duress. (See *People v. Espinoza*, *supra*, 95 Cal.App.4th at p. 1320.)

Although we conclude substantial evidence does not support the jury's verdict in count 4 for a violation of section 288, subdivision (b), it is undisputed that sufficient

20

evidence supports all the elements necessary to convict Dominguez of committing a lewd act on a child under section 288, subdivision (a). As such, we modify the judgment accordingly.

III

*DOMINGUEZ'S SENTENCE FOR COUNTS 2, 4, 6, AND 7*

Dominguez argues and the People concede that the instant matter needs to be remanded for resentencing. We agree.

Among other counts, a jury convicted Dominguez of four counts of violating section 288, subdivision (b) (counts 2, 4, 6, 7). The jury made a true finding that the crimes were committed against more than one victim within the meaning section 667.61, subdivision (e)(5). All of these crimes occurred between 1998 and 2005.

Before the trial court sentenced Dominguez to four consecutive 15-years-to-life sentences for the subject four crimes, Dominguez's trial counsel erroneously said, "the law requires" that the terms run consecutively. The trial court said that it agreed and imposed the consecutive terms.

The trial court misunderstood its discretion to impose concurrent sentences on the subject four counts. Section 667.61, subdivision (g), in effect in 2005, allowed for the imposition of consecutive or concurrent sentences for the offenses. (See *People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1262-1263.) Thus, the court was not required to sentence Dominguez to consecutive life sentences for counts 2, 4, 6, and 7, but had the discretion to do so.

21

When it is affirmatively shown on the record that the trial court had a misunderstanding as to its sentencing discretion, the usual remedy is to remand the matter for resentencing. (*People v. Rodriguez*, *supra*, 130 Cal.App.4th at p. 1263; *People v. Bruce G.* (2002) 97 Cal.App.4th 1233, 1248.) We thus remand this matter back to the trial court to allow the court to exercise its discretion under the law to sentence Dominguez consistent with this opinion.

IV

*DOMINGUEZ'S SENTENCE UNDER COUNTS 5 AND 6*

Dominguez maintains the court erred when it imposed One Strike sentences on both counts 5 and 6. We disagree.

A. Background

In count 5 (§ 288, subd. (a)) and count 6 (§ 288, subd. (b)(1)), the prosecution charged that the crimes against Nancy occurred between the same dates. Nancy testified as to two instances of molest that occurred at her home on a single day.

Nancy testified that when she was in the sixth grade, Dominguez was visiting her home. Initially, Nancy was sitting on the living room couch doing homework when approached by Dominguez. After asking Nancy to give him a "tour" of her home, Dominguez took Nancy into the study and "made [her] kiss him." Dominguez put his tongue in Nancy's mouth. Dominguez then told Nancy to "look at the piece of paper," but then exposed his penis to her when she looked.

The prosecutor asked Nancy if anything else happened that day. Nancy responded that Dominguez instructed her to "stand by the hallway and to have [her] back towards

22

him and to bend over." Nancy told Dominguez that she did not want to and went to her room. Dominguez followed. Inside her room, Dominguez told Nancy to "stand up against the wall and bend over." Nancy refused. Dominguez cautioned Nancy that if she told anyone what he did, "bad things would happen." He then kissed her again.

## B. Law and Analysis

At the time of the above crimes, subdivision (g) of section 667.61 stated, among other things, that prison terms should be "imposed on the defendant once for any offense or offenses committed against a single victim during a single occasion." Thus, if here, the evidence showed that Dominguez committed counts 5 and 6 against Nancy on "a single occasion," the trial court would have been required to impose a single sentence as to both counts. Nevertheless, the record shows that Dominguez committed counts 5 and 6 on separate occasions.

In *People v. Jones* (2001) 25 Cal.4th 98, 107, the California Supreme Court held that the phrase "a single occasion," for purposes of former section 667.61, subdivision (g), means the sex offenses "were committed in close temporal and spatial proximity." (*Jones, supra,* at p. 107.) In that case, the court held that the defendant should receive a single life sentence, rather than three consecutive life sentences, for a sequence of sexual assaults against one victim that occurred during an uninterrupted time frame and in a single location. (*Ibid.*)

Similarly, in *People v. Fuller* (2006) 135 Cal.App.4th 1336, the Court of Appeal held that the imposition of three One Strike sentences for three acts of rape against a single victim was improper. The instant case is distinguishable from *Fuller*. There, the

defendant approached Ms. L., a stranger, and struck her in the face with a gun in a parking lot before forcing her back to her apartment. (*Id.* at p. 1339.) Once inside, the defendant raped Ms. L. twice in the bedroom and then once in the living room before leaving. (*Ibid.*) Significant in *Fuller*, the facts imply that the defendant and Ms. L. were alone. (See *ibid.*) Further, "[d]efendant kept Ms. L. under his continuous and uninterrupted control during the entire time of the incident. Thus, there was a close temporal and spatial proximity between the three offenses." (*Id.* at p. 1343.)

Here, Dominguez and Nancy were not alone when he molested her. To the contrary, numerous family members were present, including parents, aunts, a grandparent, and other children. Further, these people were gathered in a fairly small, one story, two bedroom, one bathroom house. Dominguez initially molested Nancy in the study. Later, Dominguez followed Nancy to her room and molested her again. Given the small size of the house, coupled with the fact that it was full of adult family members, it may be reasonably concluded that Dominguez did not keep Nancy under his "continuous and uninterrupted control" during the entire time of the incident. Indeed, after the first act of molestation, but before the second act, Dominguez cautioned Nancy not to tell anyone what he did. The fact that Dominguez felt it necessary to stop and threaten Nancy reasonably suggests that he did not have complete control at that juncture and thus had to reassert his authority before initiating the second act of molestation against her. Accordingly, we are satisfied the trial court was not required to conclude that Dominguez's acts against Nancy did occur "during an uninterrupted time frame and in a single location." (See *People v. Jones*, *supra*, 25 Ca1.4th at p. 107.)

24

We must reverse the trial court's finding that the offenses occurred on separate occasions "only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092.)  Applying this standard, under the circumstances of this case, we conclude a reasonable trier of fact could have decided that the two acts of molestation against Nancy occurred on separate occasions.  The court did not err.

V

*DOMINGUEZ'S SENTENCE UNDER COUNT 5*

Dominguez argues that his indeterminate sentence on count 5 under former section 667.61 must be reversed because the trial court imposed this sentence without the jury finding beyond a reasonable doubt whether he was eligible for probation under former section 1203.066.  Dominguez argues that this sentence is unconstitutional because it violates his Sixth Amendment right to a jury trial under *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and its progeny, such as *Alleyne v. United States* (2013) ___ U.S. ___ [133 S.Ct. 2151] (*Alleyne*) and *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*).

Section 667.61 "sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes . . . ." (*People v. Mancebo* (2002) 27 Cal.4th 735, 741*; People v. Rodriguez* (2012) 207 Cal.App.4th 204, 211.)  The statute provides, among other things, for mandatory sentences of 15-years-to-life sentences for defendants convicted of one of the sex offenses enumerated in section 667.61, subdivision (c), and under one of the

25

circumstances listed in section 667.61, subdivision (e).[2] (Former § 667.61, subd. (b); see *People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1261 ["section 667.61—otherwise known as the one strike law . . . provides for indeterminate terms of either 15 years to life or 25 years to life for section 288, subdivision (a) and certain other sex offense if certain circumstances apply, regardless of whether the defendant has prior convictions"; italics omitted]; *People v. Palmer* (2001) 86 Cal.App.4th 440, 443 ["California's 'One Strike' law requires a sentence of 15 years to life for a person convicted of certain enumerated sexual offenses under particular aggravating circumstances"].) "Conviction of an enumerated offense alone does not trigger the One Strike law. The People also must plead and prove at least one aggravating circumstance specified in section 667.61, subdivision (d) or (e)." (*People v. Wutzke* (2002) 28 Cal.4th 923, 930.)

---

[2] Former section 667.61 provided, in relevant part: "(a) A person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 25 years except as provided in subdivision (j). [¶] (b) Except as provided in subdivision (a), a person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 15 years except as provided in subdivision (j). [¶] (c) This section shall apply to any of the following offenses: [¶] . . . [¶] (7) A violation of subdivision (a) of Section 288, unless the defendant qualifies for probation under subdivision (c) of Section 1203.066. [¶] . . . [¶] (e) The following circumstances shall apply to the offenses specified in subdivision (c): [¶] . . . [¶] (5) The defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim. [¶] . . . [¶] (h) Probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any person who is subject to punishment under this section for any offense specified in paragraphs (1) to (6), inclusive, of subdivision (c)." The Legislature has amended section 667.61 to delete the provision allowing probation if the court makes these findings under section 1203.066. (Stats. 2006, ch. 337, § 33, p. 2639.)

The jury found Dominguez guilty of committing a lewd act on a child (§ 288, subd. (a)) in count 5, a sex offense listed in section 667.61, subdivision (c), against multiple victims, a qualifying circumstance listed in section 667.61, subdivision (e). (Former § 667.61, subd. (e)(5).) Under the applicable version of the statute, Dominguez's violation of section 288, subdivision (a), subjected him to an indeterminate life term, "unless [he] qualifie[d] for probation under subdivision (c) of Section 1203.066." (Former § 667.61, subd. (c)(7).) Former section 1203.066, subdivision (c), provided the possibility of an exemption from probation ineligibility for violations of section 288, subdivision (a), where the court makes a series of findings regarding the defendant's relationship to the victim, the victim's best interests, and the possibility of the defendant's rehabilitation. (Former § 1203.066, subds. (a)(7), (c).)[3] Nevertheless, "probation is not required where favorable findings under section 1203.066[, subdivision] (c) are made.

_____

[3] Former section 1203.066 provided, in relevant part: "(a) Notwithstanding Section 1203 or any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, nor shall a finding bringing the defendant within the provisions of this section be stricken pursuant to Section 1385 for, any of the following persons: [¶] . . . [¶] (7) A person who is convicted of committing a violation of Section 288 or 288.5 against more than one victim. [¶] . . . [¶] (c) Paragraphs (7), (8), and (9) of subdivision (a) shall not apply when the court makes all of the following findings: (1) The defendant is the victim's natural parent, adoptive parent, stepparent, relative, or is a member of the victim's household who has lived in the victim's household. [¶] (2) A grant of probation to the defendant is in the best interest of the child. [¶] (3) Rehabilitation of the defendant is feasible . . . . [¶] (4) The defendant is removed from the household of the victim until the court determines that the best interests of the victim would be served by returning the defendant to the household of the victim. . . . [¶] (5) There is no threat of physical harm to the child victim if probation is granted. The court upon making its findings pursuant to this subdivision is not precluded from sentencing the defendant to jail or prison, but retains the discretion not to do so. The court shall state its reasons on the record for whatever sentence it imposes on the defendant."

The sentencing court 'retains the discretion' to find the defendant unsuitable for probation and to order imprisonment." (*People v. Wutzke*, *supra*, 28 Cal.4th at p. 932, fn. 7, citing former § 1203.066, subd. (c)(5).)

In *Apprendi*, *supra*, 530 U.S. 466, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490; see *Blakely*, *supra*, 542 U.S. at pp. 303-304 [because the " 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant," (italics omitted), a judgment may not "inflict[ ] punishment that the jury's verdict alone does not allow"]; *People v. Chism* (2014) 58 Cal.4th 1266, 1335.)

In *Alleyne*, *supra,* 133 S.Ct. 2151, the United States Supreme Court extended "the logic of *Apprendi*" to mandatory minimum sentences. (*Id.* at pp. 2157, 2160.) The Supreme Court, overruling *Harris v. United States* (2002) 536 U.S. 545, held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." (*Alleyne*, *supra*, at p. 2155.) Thus, any fact (other than a prior conviction) that increases the penalty beyond a statutory maximum or that increases a statutorily prescribed minimum penalty must be proved to a jury beyond a reasonable doubt. (See *People v. Blakely* (2014) 225 Cal.App.4th 1042, 1060; *People v. Osuna* (2014) 225 Cal.App.4th 1020, 1039.) The Supreme Court cautioned, however, that its decision "does not mean that any fact that influences judicial discretion must be found by a jury," and

28

that "broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." (*Alleyne*, *supra*, at p. 2163.)

Dominguez argues that in this case "the jury made no findings as to [his] probation-eligibility before the court sentenced him to indeterminate 15 year to life sentence on Count 5," and that "[t]his omission was federal constitutional error under *Apprendi* . . . and its progeny." Dominguez argues that *Apprendi* applies because, "as a result of the court's apparent finding that [he] was not eligible for probation pursuant to . . . section 1203.033 [sic], subdivision (c), [he] went from punishment on Count 5 with a determinate sentence to punishment under the alternate One Strike sentencing scheme, requiring a life sentence." According to Dominguez, "the statutory language of . . . section 667.67, subdivision (c)[(7)] describes a class of offenses subject to [the] elevated One Strike penalties, requiring a jury finding as to a defendant's probation eligibility beyond a reasonable doubt before the life sentence can be imposed."

As Dominguez acknowledges, however, the court in *People v. Benitez* (2005) 127 Cal.App.4th 1274 (*Benitez*) rejected "a similar argument" and held that "the proviso in . . . section 667.61, subdivision (c)(7) (that a defendant is unqualified for probation) is not an element of the enhancement to be negated upon proof to a jury. Rather, it is a legislative grant of authority to the trial court to entertain a request for probation (should a defendant satisfy the criteria in section 1203.066, subd. (c)) despite eligibility otherwise for sentencing under section 667.61." (*Benitez, supra,* at p. 1278; italics omitted.) The court in *Benitez* further explained that "[f]inding a defendant ineligible for probation is not a form of punishment, because probation itself is an act of clemency on the part of the

29

trial court. [Citation.] Because a defendant's eligibility for probation results in a reduction rather than an increase in the sentence prescribed for his offenses, it is not subject to the rule of *Blakely*[, *supra*, 542 U.S. 296]." (*Benitez, supra,* at p. 1278; italics omitted; see *People v. Anderson* (2010) 50 Cal.4th 19, 32 [there is no right to probation; it is " 'an act of clemency and grace' "]; *People v. Mancebo*, *supra*, 27 Cal.4th at p. 754 ["probation is not punishment"; it is "a matter of privilege, not right"]; *People v. Holman* (2013) 214 Cal.App.4th 1438, 1474 ["[p]robation . . . is an act of clemency . . . , and 'its primary purpose is rehabilitative in nature' "].)

We agree with *Benitez* that *Blakely* and *Apprendi, supra,* 530 U.S. 466,[4] do not require a jury to make findings that may reduce the "statutory maximum" punishment by a grant of probation. (*Benitez*, *supra*, 127 Cal.App.4th at pp. 1277-1278; see *Blakely, supra*, 542 U.S. at pp. 301-302.) A conviction under section 288, subdivision (a), combined with any of the circumstances specified in former section 667.61, subdivision (e), requires the court to impose an indeterminate sentence of 15 years to life. At the time Dominguez committed his offenses, the exception applied when the court made findings on all five factors listed in former section 1203.066, subdivision (c), there was no other statutory proscription against probation, and the court exercised its discretion to grant probation rather than impose a prison sentence. *Apprendi* does not apply where, as here, the jury made all of the factual findings required for the imposition of the "statutory

---

4      The court in *Benitez, supra,* 127 Cal.App.4th 1274, does not discuss *Apprendi, supra,* 530 U.S. 466, but the court in *Blakely, supra,* 542 U.S. 296, does. The court's reasoning in *Blakely* is consistent with its reasoning in *Apprendi.*

30

maximum" sentence for a violation of section 288, subdivision (a), and a qualifying multiple circumstance of former section 667.61, subdivision (e), here the multiple victim circumstance of section 667.61, subdivision (e)(5).

Similarly, where the jury has made the requisite findings under section 288, subdivision (a), and former section 667.61, subdivision (e), *Alleyne* does not require that the jury must make the findings that may qualify the defendant for discretionary probation under former section 1203.066, subdivision (c). Failing to qualify for an exemption to probation ineligibility does not increase the mandatory minimum punishment for an offense because " '[f]inding a defendant ineligible for probation is not a form of punishment . . . .' " (*People v. Woodward* (2011) 196 Cal.App.4th 1143, 1152; see § 1203, subd. (a) [probation is the "suspension of the imposition or execution of a sentence and the order of conditional and revocable release in the community under the supervision of a probation officer"].) Moreover, obtaining an exemption from probation ineligibility under former section 1203.066, subdivision (c), depends on the court's exercise of discretion. Thus, even if a jury were to make findings under former section 1203.066, subdivision (c), that the defendant was the victim's parent, probation was in the child's best interest, rehabilitation was feasible, and there was no threat of physical harm to the child victim if probation were granted, the court would still have the discretion to deny probation. (See former § 1203.066, subd. (c)(5) ["court upon making its findings pursuant to this subdivision is not precluded from sentencing the defendant to jail or prison, but retains the discretion not to do so"].) The Supreme Court in *Alleyne* preserved

31

such discretion when it took "care to note" that its decision did not eliminate "the broad discretion of judges" in sentencing matters. (*Alleyne*, *supra,* 133 S.Ct. at p. 2163.)

Dominguez maintains that *Benitez* was "wrongly decided" because the court in that case misinterpreted former section 667.61. At the time, subdivision (c) of former section 667.61 listed seven convictions that required imposition of a life sentence (assuming one of the qualifying circumstances applied). (See *Benitez*, *supra*, 127 Cal.App.4th at p. 1277, fn. 4.) The first six, subdivisions (c)(1) through (c)(6) of former section 667.61, said nothing about probation, but the seventh, a violation of section 288, subdivision (a), contained the qualifying language, "unless the defendant qualifies for probation under subdivision (c) of Section 1203.066." Subdivision (h) of former section 667.61 provided that "[p]robation shall not be granted to . . . any person who is subject to punishment under this section for any offense specified in paragraphs (1) to (6), inclusive." (*Benitez, supra*, at p. 1277, fn. 4.) Dominguez argues that the *Benitez* court's interpretation of former section 667.61 is incorrect because it creates a redundancy: the reference to probation in subdivision (c)(7) is surplusage because subdivision (h) prohibits probation for subdivisions (c)(1) through (c)(6) convictions (and not subdivision (c)(7) convictions), so that "the subdivision (c)(7) language just restates what is already clear in subdivision (h)."

We agree with the *Benitez* court's rejection of this very argument too: "Unlike the defendant, we do not find that this interpretation would render the proviso redundant. Subdivision (h) of section 667.61 concerns the prohibition of a grant of probation to persons committing the offenses in the other six paragraphs of subdivision (c)(1)-(6),

32

which is an apparent effort to dispel any ambiguity resulting from the lack of any express reference to the subject of probation in those paragraphs. Thus, [section 667.61,] subdivision (c)(7)'s proviso and subdivision (h) do not address the same issue." (*Benitez*, *supra*, 127 Cal.App.4th at p. 1278; italics omitted.)

Dominguez also contends that former section 667.61, subdivision (c), "refers to classification of 'offenses' to which this 'section' shall 'apply.' " Dominguez argues that this language "indicates that the probation qualification for section 288[, subdivision] (a) offenses is meant to describe a class of offenses/offenders, not as a surplusage serial directive authorizing a grant of probation which is already authorized under other law. This specific class of offenses/offenders was discussed in *People v. Jeffers* [(1987) 43 Cal.3d 984, 994-1000]: incestuous and opportunistic intrafamilial offenders who have brighter prospects for rehabilitation and eventual reunification with a healthy family. [Citation.] [¶] . . . Nothing in [former section 667.61, subdivision (c),] indicates the legislature sought to eliminate the middle ground (determinate term) treatment, which punishes and hopefully rehabilitates, yet permits eventual family reunification, for this class of offenders. [Dominguez's] construction [of former section 667.61, subdivision (c),] merely places this class of offenses among a host of other sex offenses (including attempts and statutory rape)[,] which are not necessarily subject to the drastic life terms."

The language of the statute does not support Dominguez's argument. Former section 667.61 did not create or describe a class of offenses or offenders entitled to determinate term treatment. It created a " 'limited exception' " to "the ban on probation"

33

otherwise applicable to convictions for "sex crimes qualifying for One Strike treatment" under the statute. (*People v. Wutzke*, *supra*, 28 Cal.4th at pp. 930, 932.)

The jury made all of the findings required for the statutory maximum under former section 667.61: a conviction of violating section 288, subdivision (a), and a qualifying circumstance of section 667.61, subdivision (e). Dominguez's sentence is not unconstitutional under *Apprendi, supra,* 530 U.S. 466.

## VI

### *ABSTRACT OF JUDGMENT*

Dominguez argues, and the People concede, that the abstract of judgment must be corrected to reflect Dominguez's actual sentence. Because we are remanding this matter for resentencing consistent with this opinion, we also order the superior court to prepare and file a new abstract of judgment consistent with Dominguez's new sentence.

## DISPOSITION

The judgment is modified to reflect that Dominguez has been convicted of committing a lewd act on a child in violation of section 288, subdivision (a) under count 4. We vacate Dominguez's sentence and remand the matter back for resentencing consistent with this opinion. In conjunction with Dominguez's new sentence, the superior

34

court shall prepare and file a new abstract of judgment, and forward the abstract of judgment to the Department of Corrections and Rehabilitation.  We otherwise affirm the judgment as modified.


_____

HUFFMAN, Acting P. J.

WE CONCUR:


_____

O'ROURKE, J.


_____

AARON, J.